RECEIVED
SDNY PRO SE OFFICE

2022 DEC 19 PM 3:36

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JESSICA NICOLE REID, individually, | ) |
| Plaintiff, | ) CIVIL ACTION NO. |
| vs. | ) |
| LEONARD LARRY MCKELVEY pka CHARLAMAGNE THA GOD, individually, and IHEARTMEDIA, INC., | ) |
| Defendants. | ) |

## PLAINTIFF'S ORIGINAL COMPLAINT

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

COMES NOW, JESSICA NICOLE REID, Plaintiff herein, by counsel, brings this action against the LEONARD LARRY MCKELVEY pka CHARLAMAGNE THA GOD, individually, and IHEARTMEDIA, INC., for damages, and respectfully alleges as follows:

I

### THE PARTIES

1. Plaintiff Jessica Nicole Reid ("Ms. Reid" or "Plaintiff") is a resident and domiciliary of the State of North Carolina.

2. Defendant Leonard Larry McKelvey pka Charlamagne tha God ("Charlamagne") is a radio host and television personality. Charlamagne is currently a resident and domiciliary of the State of New York.

3. Defendant iHeartMedia, Inc. ("iHeartMedia") is an entity incorporated in the State of Texas and does business in the State of New York.

///

1

## II

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because the parties are citizens of different states and the amount in controversy exceeds $75,000.

5. Venue is proper pursuant to 28 U.S.C. § 1391(b)(1) as to Charlamagne because he resides in this judicial district.

6. Venue is proper pursuant to 28 U.S.C. § 1391(c)(2) as to iHeartMedia because iHeartMedia is subject to the Court's jurisdiction as it does business in this judicial district.

## III

## FACTUAL ALLEGATIONS

### A. Ms. Reid Meets Charlamagne

7. In 2001, Ms. Reid met Charlamagne through a friend of hers named Rico. When they first met, Ms. Reid was 15 years old and Charlamagne was 20 years old.

8. At that time, Charlamagne was a radio DJ at Z93 Jamz in Charleston, South Carolina.

9. The first time Ms. Reid met Charlamagne, Rico and Ms. Reid were out together and Rico had to drive by the radio station to see Charlamagne.

10. When Rico and Ms. Reid arrived at the radio station, Rico introduced Ms. Reid to Charlamagne. Ms. Reid thought Charlamagne seemed like a nice guy.

11. They all talked briefly, mostly about music, and then Rico and Ms. Reid left the radio station.

12. A few days later, Ms. Reid received a phone call from Charlamagne. Ms. Reid did not give Charlamagne her number, so she assumed that Rico had given it to him.

13. Ms. Reid spoke to Charlamagne, and he said that he liked Ms. Reid and wanted to take her out. However, Ms. Reid told Charlamagne that she was not interested in him romantically.

14. Charlamagne said he understood and wanted to know if they could be friends

instead, to which Ms. Reid agreed.

15. After that, Charlamagne would call Ms. Reid from time to time and they began a platonic friendship. At times, Ms. Reid would call Charlamagne at the radio station and request a song and Charlamagne would play it.

16. Weeks later, Charlamagne said that he wanted to take Ms. Reid and her friends out to get something to eat. Ms. Reid agreed, and invited her friend to lunch with her and Charlamagne.

17. Charlamagne drove over to pick Ms. Reid and her friend, and at that time, Charlamagne met Ms. Reid's mother. Charlamagne spoke with her and assured her that Ms. Reid and her friend were safe and that they were just going out to eat.

18. After Ms. Reid's mother met Charlamagne, her mother felt comfortable letting Ms. Reid and her friend go out to lunch. Charlamagne took Ms. Reid and her friend to a Chinese Restaurant buffet. Charlamagne had about three other guys with him. Everyone seemed friendly and they all had a nice time.

19. In early June 2001, Ms. Reid received a phone call from Charlamagne. Charlamagne said his birthday was coming up and he was having a party and wanted Ms. Reid and some of her friends to come.

20. Ms. Reid initially told Charlamagne "no," but Charlamagne responded that he wanted Ms. Reid to be there as she was like Charlamagne's "little sister" and really wanted her to come. Charlamagne also said that it was going to be a big party and that Ms. Reid and her friends should all bring our bathing suits.

21. Ms. Reid then agreed to attend Charlamagne's party, and she asked her sister-in-law at the time, Malika Joyner ("Ms. Joyner") to join them, and Ms. Joyner said "yes."

### B. Charlamagne Rapes Ms. Reid at The Short Stay Naval Recreation Center, Ville #30

22. On June 8, 2001, the day of Charlamagne's birthday party, Charlamagne's cousin, Kinta Parker and a few other men picked up Ms. Reid and Ms. Joyner around 4:00 p.m. Charlamagne was supposed to come, as well, but he was travelling separately.

23. Ms. Reid felt uncomfortable since there were so many men with them, but since she and Charlamagne had a good friendship, she figured that she would be safe.

24. On the way to the party, they stopped at a house where they waited for Charlamagne. When we entered the house, Charlamagne introduced Ms. Reid to his dad. Then, they all left for the party. After leaving Charlamagne's family's house, they stopped at a store and Ms. Reid called her mom at a nearby pay phone to let her know that she and Ms. Joyner were okay.

25. Once they all made it to the residence, called The Short Stay Naval Recreation Center, Ville #30 (the "Premises"), it was night time. Since it was dark and getting late, Ms. Reid assumed that they would not spend any time at the lake and she wondered what they were going to do now.

26. When Ms. Reid walked inside the Premises, there was nothing but men there with Ms. Reid and Joyner. Ms. Reid saw some other females outside in the back and could see them from the screen door.

27. At this point, Ms. Reid felt uncomfortable at Charlamagne's party as there were so many men there. Charlamagne could see that Ms. Reid was uncomfortable because Charlamagne told Ms. Reid to relax and he told Ms. Reid that everything was okay.

28. Charlamagne then asked Ms. Reid if she wanted a drink, and Ms. Reid initially told him "no," but Ms. Joyner said that she would have one. Charlamagne then made a drink for Ms. Joyner and gave it to her.

29. Charlamagne then reassured Ms. Reid and said, "Look, I'm not going to let anything happen to you. You are like my little sister. Nothing will happen to you tonight. I'll take care of you. It's my birthday, just chill and have some fun." Ms. Reid then changed her mind about the drink, and Charlamagne made her a drink and she sat on the couch.

30. Ms. Reid and Ms. Joyner were sitting next to each other and Ms. Joyner was almost finished with her drink and Ms. Reid had about half of her drink left. Charlamagne then made Ms. Joyner another drink, but she could not drink it.

31. After a few minutes went by, Ms. Reid looked at Ms. Joyner, as Ms. Joyner

started to look sick. When Ms. Reid asked Ms. Joyner if she was okay, Ms. Joyner started throwing up. Some of the men at the party gave Ms. Joyner some napkins, but they were laughing at her in the process.

32. Ms. Reid and Ms. Joyner then sat on the couch and Ms. Joyner still looked sick. Eventually, Ms. Reid started to feel dizzy as well, so she decided to go to the bathroom and stay in there until she felt better. However, when Ms. Reid stood up, she collapsed as it felt like her legs gave out and she could not walk.

33. Ms. Reid heard the men at the party laughing at her, then she heard Charlamagne laughing and he said, "Take her ass upstairs."

34. Two men then carried Ms. Reid upstairs and took her into one of the bathrooms upstairs. Ms. Reid later found out that the two men are named "Larry" and "Boo." Ms. Reid had on a dress on that night. Once they got in the bathroom, Larry and Boo started pulling up her dress. The men were rubbing on her breasts and butt, and they placed their fingers in her vagina, with force. They also started kissing her. To make matters worse, Ms. Reid was still conscious and aware of everything that was happening to her, but she still could not move her body.

35. When the men were finished sexually assaulting her, they left her in the bathroom. Ms. Reid laid on the bathroom floor and cried. Ms. Reid did not understand what was going on, why the men were sexually assaulting her, and why she could not move. She was very afraid and did not know what to do.

36. Shortly thereafter, Larry opened the bathroom door a few times to peak in. Then, Charlamagne came into the bathroom and carried Ms. Reid into a bedroom and laid her on the bed.

37. Charlamagne came back into the bedroom shortly after that. Ms. Reid knew it was him because he was talking to Ms. Reid and he said, "It's me, this is Charlemagne. Didn't I tell you I was going to take care of you?" In addition to hearing Charlamagne's voice when he was on top of Ms. Reid, she also saw his face (the room was dark, but when Charlamagne opened the door, his face was illuminated by the hallway light). Charlamagne then pulled Ms. Reid's

COMPLAINT FOR DAMAGES

1  clothes off of her and proceeded to kiss Ms. Reid all over her body. Ms. Reid tried to move, but
2  she was still weak, and Charlamagne had all his weight on her.
3      38.    Ms. Reid just laid there and cried helplessly as Charlamagne took advantage of
4  her. Charlamagne was having sex with Ms. Reid and she could not do anything about it. In
5  addition to the penetration, there was also oral and he attempted to get Ms. Reid to perform oral
6  on him. Charlamagne also tried to place her body on top of him but she was unstable and her
7  body kept wobbling. Ms. Reid recalls haring Charlamagne stating, "Come on now, you gotta
8  do something, suck my d**k or something."
9      39.    When Charlamagne was done, he left the room and Ms. Reid was left lying on the
10 bed. Ms. Reid felt like she had been lying there forever and was very confused and scared.
11     40.    Later, someone came in the room and turned on the lights and saw Ms. Reid lying
12 there. They must have said something to the other guests because shortly thereafter, there were
13 several people standing in the doorway looking at Ms. Reid. Ms. Joyner also walked in the
14 room, barely able to stand and slurring her speech, and asked Ms. Reid where her clothes were.
15     41.    Ms. Reid started yelling and screaming that she was raped after Ms. Joyner asked
16 her what happened, and Ms. Reid asked "Where are my clothes?!" Ms. Reid still felt like she
17 was drunk even though she did not have that much to drink. Larry, one of the men who
18 assaulted Ms. Reid, said "No one touched you, shut the f**k up before I kick you in the head."
19     42.    Ms. Reid screamed kept yelling, and everyone who was standing in the doorway
20 ran downstairs. Ms. Reid does not remember how she got her clothes back on, but she assumed
21 Ms. Joyner helped her since no one else was in the room at the time.
22     43.    Ms. Reid and Ms. Joyner both gathered up enough strength to help each other
23 down the stairs. When they arrived downstairs, they noticed that everyone left the house. Ms.
24 Reid and Ms. Joyner then walked outside, and Ms. Reid fell to the floor and started crying. Ms.
25 Reid told Ms. Joyner that she loved her, as she was scared and did not know what was going to
26 happen to them.
27     44.    Out of nowhere, a man pulled up to the front of the Residence where Ms. Reid
28 and Ms. Joyner were sitting, and he asked them if they wanted to use his phone. Ms. Reid was

still out of it and scared, but Ms. Joyner was able to use the phone.

45.  Ms. Reid's mother was trying to get information from Ms. Joyner, but Ms. Joyner did not know anything, so she gave the phone back to the man. The man spoke with Ms. Reid's mother and said that he would not leave Ms. Joyner and Ms. Reid until the police arrived.

46.  Shortly thereafter, the police and ambulance came, and Ms. Reid was taken to the Summerville Medical Center. Ms. Reid recalls the ambulance ride vividly, as she was still in shock, hyperventilating, and felt unsafe. She just wanted to go home and was crying and screaming, and the paramedics did their best to calm Ms. Reid down.

47.  When Ms. Joyner and Ms. Reid arrived to Summerville Medical Center, she saw her mother and brother, and she was in so much pain. Ms. Reid cried and hugged her mother and brother as she was very relieved to see them.

48.  Ms. Reid had to go through the rape kit procedure, which was painful because she was still sore. Ms. Reid was discharged shortly thereafter.

49.  The next few days after the rape was very difficult for Ms. Reid. She locked herself in her room and did not say much to anyone. Ms. Reid and Ms. Joyner later went to the police to give their statements and Ms. Reid wanted to press charged and speak in Court so Charlamagne and his friends would go to jail.

50.  However, Ms. Reid's mother would not allow it. Ms. Reid's mother thought that Ms. Reid had been through enough and that putting Ms. Reid on the stand was not a good idea. Therefore, the decision not to prosecute Charlamagne and his friends made for Ms. Reid by her mother, and there was nothing she could do about it, as she was a minor at the time.

51.  Ms. Reid eventually moved to Virginia Beach in September 2001, as her mother thought a new start was a good idea.

52.  Around Christmas time in 2001, Ms. Reid visited her grandmother in Charleston, South Carolina. Ms. Reid went out with one of her friends to an Armory Christmas Party, and she saw Charlamagne there.

53.  This was the first time Ms. Reid had seen Charlamagne since the June 8, 2001

rape, and Ms. Reid got very upset. Ms. Reid tried to attack Charlamagne, but Ms. Reid's friend held her back. Ms. Reid then called her uncle and grandmother and they told Ms. Reid to go back to her grandmother's house.

### C. Sheriff's Investigation and Charlamagne's Arrest

54. On June 9, 2001, the Berkeley County Sheriff's Department arrived at the scene of the rape and noticed that there was a strong odor of marijuana at the Premises and several empty alcoholic beverages, which gave the Sheriff the impression that a party had taken place at the Premises.

55. The Sheriff retrieved a silver bracelet in the bedroom which belonged to Ms. Reid and identified a hole in the wall that was later identified to be caused by Ms. Reid.

56. On June 12, 2001, Magistrate Judge Elizabeth S. Harper issued an Arrest Warrant for Charlamagne (G-773948) for Criminal Sexual Conduct with a Minor, 2nd Degree Code: 16-3-655) (the "Warrant).

57. The Warrant stated:

> "That on or between June 08, 2001 and June 09, 2001 at Short Stay Villa # 30 Moncks Corner, S.C., located within the County and State aforesaid the Defendant, LENARD LARRY MCKELVEY, did commit the offense of CRIMINAL SEXUAL CONDUCT WITH A MINOR 2ND DEGREE in violation of §16-3-655 of the South Carolina Code of Laws 1976, As Amended, in that the Defendant, who is a twenty two year old adult male, did willfully, unlawfully and feloniously engage in penile/vaginal intercourse with a fifteen year old female child. Facts to establish the aforesaid: 1) On the morning of 06-09-01 the Berkeley County Sheriff's Office was contacted by Joselyn Reid, the mother of the minor victim, after she received a phone call advising her of a sexual assault that had occurred with her fifteen year old daughter. 2) The minor female was transported by EMS to Summerville Medical Center for treatment of injuries sustained during the sexual assault. 3) Affiant responded to the Summerville Medical Center and obtained a verbal and/or written statement from the minor female, which implicated the Defendant in the sexual assault 4) Examinations conducted by Summerville Medical Center

*corroborated that a sexual assault had occurred. 5) The affiant, through investigation, was able to locate the incident location and confirm that this incident occurred in Berkeley County.*

58. On June 22, 2001, Charlamagne was placed under arrest pursuant to Judge's Harper's outstanding Warrant. Charlamagne was placed in the Berkeley County Detention Center.

59. On June 25, 2001, Charlamagne was released from custody on a $10,000 Surety Bond.

60. On August 28, 2001, Charlamagne was ordered by the Berkeley Court to submit to a blood test as part of the criminal investigation

61. On August 29, 2001 The State of California, County of Berkeley filed two Indictments against Charlamagne:

i. Criminal Sexual Conduct with a Minor, a Second Degree Offense:

*"That Lenard L. McKelvey did in Berkeley County on or about the 8th day of June, 2001, willfully, unlawfully and feloniously engage in penile/vaginal intercourse with a 15 year old female. This is in violation of §16-3-655(2) of the South Carolina Code of Laws (1976) as amended.";* and

ii. Contributing to the Delinquency of a Minor:

*"That LENARD L. MCKELVEY did in Berkeley County between the 8th day of June, 2001 and the 9th day of June, 2001, knowingly and willfully encourage, aide or cause to do acts which were intended to cause or influence Jessica Nicole Reid to deport herself in a manner so as to willfully injure or endanger her morals or health. This is in violation of §16-17-490 of the South Carolina Code of Laws (1976) as amended."*

**D.  Charlamagne's Charges were Dismissed**

62. On March 9, 2002, the official result of the rape kit examination was inclusive as no analysis was performed.

63. On June 10, 2002, Charlamagne's Indictment for Criminal Sexual Conduct with a Minor was not prosecuted due to Ms. Reid "not cooperating" with the criminal investigation.

64. As stated above, Ms. Reid's mother prevented Ms. Reid from cooperating with the investigation and they moved to Virginia Beach so Ms. Reid could get a fresh start.

65. On June 10, 2002, Charlamagne pleads to "Contributing to the Delinquency of a Minor," and it was classified as a "Non-Violent" act by the Court.

66. As a result of Charlamagne's plea deal, he was sentenced to 3 years' probation, and had to pay a $103.00 fine to the Court.

### E. Charlamagne, Sometimes using iHeartMedia's Radio Platform, Denies Raping Ms. Reid and Makes a Slew of False, Insulting Claims about Her

67. As explained above, due to circumstances beyond Ms. Reid's control, she was unable to appear in court to testify, and as a result, Charlamagne took a plea for a lesser charge and never served time for raping Ms. Reid.

68. Ms. Reid has tried to get justice, but to no avail. And to make matters worse, everyone that Ms. Reid reached out to, including iHeartRadio, ignored her and still allowed Charlamagne to speak on their platform.

69. Every time Ms. Reid turns on the radio and hears his voice, sees him on TV and walks past his books in the stores, she is reminded of what Charlamagne did to her. Her ongoing emotional distress has taken a toll on her mental health and has retraumatized her.

70. Charlamagne had an interview about the Incident where he lied about what happened, called Ms. Reid a "groupie," said he never met Ms. Reid, that he had absolutely nothing to do with it and bragged about "beating the case."

71. On July 21, 2013, Charlamagne was speaking to DJ Akademiks about Ms. Reid's rape and he misstates the circumstances of the rape.[1]

72. On April 17, 2019, Charlamagne was on The Breakfast Club (a weekday morning show on iHeartMedia's platform), and he spoke about Ms. Reid being involved in a smear campaign, which is false.[2]

---

[1] https://www.youtube.com/watch?v=e0EmL0p0Yps&t=48s
[2] https://youtu.be/-dWGoBXOtKA

73. In Charlamagne's book, Black Privilege, on pages 82-85, Charlamagne discusses Ms. Reid's rape and states that Ms. Reid willingly went into a room to have sex with his friends. Charlamagne referred to Ms. Reid as a person who was doing drugs and willingly went into a dark room to have sex with men, on the night that Ms. Reid was raped. Charlamagne's description of the event that took place was wrong, hurtful and defaming:

> "I learned that once and for all on June 8, 2001....The night started off great -lots of drinking, smoking, dancing and bullshitting. But at some point one of the girls passed out and when she woke up later that night, she claimed that some of the dudes at the party had sexually assaulted her...Apparently she had gone in a dark room with some guys to have sex and when she started to protest, one of them said, "Relax, it's Charlamagne."

74. Charlamagne's false statements, some of which were made on iHeartMedia's platform, were made with knowledge of falsity or reckless disregard for the truth.

75. Charlamagne has admitted on iHeartMedia's platform and another show that he has raped women in the past.[3,4]

76. Ms. Reid has also created a petition to file Charlamagne from iHeartMedia's platform.[5]

### F. Ms. Reid Suffers Reputation and Other Harm

77. Ms. Reid was 15 years old when this happened to her in June 8, 2001. She is now 37 and is still trying to get her life back.

78. She has tried to press charges against Charlamagne in 2006 but the person she spoke to at the sheriff's office told her that the statute of limitations had already passed and there was nothing she could do. She tried again two years later in 2008. Since no one would help her, she decided to start her personal journey of healing to try to put the matter behind her.

79. Due to the rape, Ms. Reid has been suicidal, been prescribed antidepressants, and

---

[3] https://twitter.com/sideconvos/status/1019369517280124928?s=46&t=14GdJVb5Khr34K2b-cV1ag
[4] https://twitter.com/closurejustice4/status/1082374440594354176?s=51&t=ytlW24bcr9Iz9EUsHMp5pg
[5] https://www.thepetitionsite.com/558/350/663/we-demand-that-charlamange-the-god-of-the-breakfast-club-be-fired-for-sexual-assault/

1  underwent counseling in 2015 and 2017. She has gotten into fights and arguments with her
2  family because of the Incident, she feels as though she lost who she was, and there are some
3  days where she cannot get out of bed.

4  80.  Ms. Reid has suffered from extreme post-traumatic stress disorder and she still
5  has dreams and flashbacks of the incident to this day.

6  81.  Ms. Reid also has issues with intimacy as a result of the attack. Her intimacy issues
7  stem from fear, and she subconsciously associates physical intimacy and touch with pain and
8  danger, and as a result, Ms. Reid often tenses up during sex and experience a lot of cramping
9  and burning during intimacy. This is all a defense mechanism that her body does to protect her.
10 As such, it is very difficult for Ms. Reid to form romantic relationships. She is currently
11 working through her issues, but she still has a huge fear of being around men, especially in an
12 intimate setting.

13 82.  Over the past few years, Ms. Reid has been seeing Charlamagne more and more
14 on TV and the radio (such as MTV, VH1, social media, magazines, books, etc.), which adds to
15 her emotional distress as Ms. Reid cannot seem to be able to escape from Charlamagne.

16 83.  Charlamagne making false and misleading statements regarding Ms. Reid's rape
17 has triggered the same pain and hurt all over again. It is the reason she sought counseling.

18 84.  Ms. Reid is also actively in therapy as well as physical therapy from the assault,
19 which has been very hard for her.

20 85.  Ms. Reid wants to moves on with her life and wants to feel whole again.

## IV

## CAUSES OF ACTION

### COUNT I

### Sexual Assault

### (Against Charlamagne)

86.  Ms. Reid incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

87.  Charlamagne committed sexual assault against Ms. Reid when he forcibly raped

and groped her on June 8, 2001.

88. Charlamagne intentionally, and without her consent, attacked Ms. Reid to satisfy his own sexual desires. Charlamagne's physical contact with Ms. Reid was offensive and wrongful under all the circumstances. Charlamagne continued to attack and rape Ms. Reid, but she was in no condition to fight back. Even though Ms. Reid was crying during the attack, Charlamagne continued to rape her.

89. Charlamagne's conduct was the direct and proximate cause of Ms. Reid's past and future substantial damages, including significant pain and suffering, lasting psychological and pecuniary harms, loss of dignity, and invasion of privacy.

90. Charlamagne's actions constitute sexual offenses as defined in Article 130 of the New York Penal Law, including but not limited to rape in the first degree (§ 130.35), rape in the third degree (§ 130.25), sexual abuse in the first degree (§ 130.65), sexual abuse in the third degree (§ 130.55), sexual misconduct (§ 130.20), and forcible touching (§ 130.52).

91. Plaintiff's claim for battery is thus timely under the Adult Survivors Act, N.Y. C.P.L.R. § 214-j.

## COUNT II

### Assault

### (Against Charlamagne)

92. Ms. Reid incorporates by reference the allegations previously stated, as though fully set forth at length herein.

93. At the time and place aforesaid Charlamagne, intentionally, willfully, wantonly and maliciously sexually assaulted Ms. Reid and behave in such a manner to cause Ms. Reid to reasonably believe she was about to be sexually assaulted in a harmful and offensive manner.

94. At no time during the events described in the preceding paragraph, nor at any time prior thereto, did Ms. Reid consent to any of Charlamagne's conduct.

95. As a direct and proximate result of Charlamagne's conduct as aforesaid, coupled with his present ability to carry them out, Ms. Reid felt the imminent apprehension of such contact, and she therefore suffered severe emotional distress and other injuries to her person, in

COMPLAINT FOR DAMAGES

an amount to be shown according to proof.

96. As a direct, legal and proximate result of the actions of Charlamagne, Ms. Reid sustained serious and permanent injuries to her person, all to her damage in an amount to be shown according to proof and within the jurisdiction this Court.

97. As a direct, legal and proximate result of the aforesaid acts of Charlamagne, Ms. Reid was compelled to and did employ the services of hospitals, physicians and surgeons, nurses, and the like, to care for and treat her, and did incur hospital, medical, professional and incidental expenses, and Ms. Reid is informed and believes, and upon such information and belief alleges, that she will necessarily by reason of her injuries, incur additional like expenses for an indefinite period of time in the future, all to Ms. Reid's damage in a sum to be shown according to proof.

## COUNT III

### Battery

### (Against Charlamagne)

98. Ms. Reid incorporates by reference the allegations previously stated, as though fully set forth at length herein.

99. On or about June 8, 2001, Charlamagne intentionally and recklessly did acts which resulted in offensive contact with the Ms. Reid's person, including but not limited to: raping Ms. Reid.

100. Charlamagne did the aforementioned acts with the intent to cause a harmful or offensive contact the body of Ms. Reid.

101. As a direct, legal and proximate result of the actions of Charlamagne, Ms. Reid sustained serious and permanent injuries to her person, all to her damage in an amount to be shown according to proof and within the jurisdiction of this Court.

102. As a direct, legal and proximate result of the aforesaid acts of Charlamagne, Ms. Reid was compelled to and did employ the services of hospitals, physicians and surgeons, nurses, and the like, to care for and treat her, and did incur hospital, medical, professional and incidental expenses, and Ms. Reid is informed and believes, and upon such information and

belief alleges, that she will necessarily by reason of her injuries, incur additional like expenses for an indefinite period of time in the future, all to Ms. Reid's damage in a sum to be shown according to proof.

## COUNT IV

## Defamation

## (Against Charlamagne and iHeartMedia)

103.   Ms. Reid incorporates by reference the allegations previously stated, as though fully set forth at length herein.

104.   Charlamagne, on numerous occasions and often using iHeartMedia's platform, made false, misleading and defamatory claims regarding Ms. Reid's June 8, 2001 rape on various written, media and TV formats to their listeners, viewers and readers.

105.   His statements identified—and was "of or concerning"—Ms. Reid.

106.   His statements contained numerous falsehoods about Ms. Reid, whether on its face and/or by virtue of a clear implication affirmatively intended by Charlamagne.

107.   Charlamagne's false statement regarding Ms. Reid was defamatory *per se.*

108.   Charlamagne's false and defamatory statement was published throughout New York State and around the world on television, in newspapers and magazines, on social media, and elsewhere in print and on the internet. Charlamagne ensured that his false and defamatory statement about Ms. Reid would receive a wide circulation by providing it to the national press.

109.   Charlamagne made his false and defamatory statement knowing that it was false or with reckless disregard for its truth or falsity.

110.   Charlamagne made his false statement with ill will and spite, and with wanton, reckless, or willful disregard for its injurious effects on Ms. Reid and Ms. Reid's rights.

111.   Charlamagne's false and defamatory statement caused Ms. Reid to suffer reputational, emotional, and professional harm.

///

///

///

## COUNT V

## Intentional Infliction of Emotional Distress

## (Against Charlamagne and iHeartMedia)

112. Ms. Reid incorporates by reference the allegations previously stated, as though fully set forth at length herein.

113. Ms. Reid is informed and believes, and thereon alleges, that the actions of Defendants Charlamagne and iHeartMedia were intentional, extreme, and outrageous.

114. Ms. Reid is further informed and believes, and thereon alleges, that such actions were done with the intent to cause serious emotional distress or with reckless disregard of the probability of causing Ms. Reid serious emotional distress.

115. As a direct, legal and proximate result of the actions of Defendants Charlamagne and iHeartMedia, Ms. Reid suffered severe emotional distress which has caused Ms. Reid to sustain severe, serious and permanent injuries to her person, all to her damage in a sum to be shown according to proof and within the jurisdiction of this Court.

116. As a direct, legal and proximate result of the aforesaid actions of Defendants Charlamagne and iHeartMedia, Ms. Reid was compelled to and did employ the services of hospitals, physicians and surgeons, nurses, and the like, to care for and treat her, and did incur hospital, medical, professional and incidental expenses, and Ms. Reid is informed and believes, and upon such information and belief alleges, that she will necessarily by reason of her injuries, incur additional like expenses for an indefinite period of time in the future, all to Ms. Reid's damage in a sum to be shown according to proof.

## COUNT VI

## NEGLIGLENT INFLICTION OF EMOTIONAL DISTRESS

## (Against Charlamagne and iHeartMedia)

117. Ms. Reid alleges and incorporates by references, all previous allegations in this Complaint as though fully set forth herein.

118. Defendants Charlamagne and iHeartMedia had a duty to prevent harm to its listeners, viewers and readers, including Ms. Reid.

119. Defendants Charlamagne and iHeartMedia's conduct toward Ms. Reid was negligent.

120. Defendants Charlamagne and iHeartMedia conduct toward Ms. Reid caused Ms. Reid to suffer severe emotional distresses.

121. Defendants' negligence was a substantial factor in causing Ms. Reid's severe emotional distress.

## PRAYER FOR RELIEF

WHEREFORE, Ms. Reid respectfully requests that the Court:

1. Order Charlamagne and iHeartMedia to retract their defamatory statements;

2. Award Ms. Reid compensatory damages in an amount to be determined at trial;

3. Award Ms. Reid punitive and exemplary damages in an amount to be determined at trial; and

4. Award Ms. Reid pre- and post-judgment interest, costs, and such other and further relief as this Court may deem just and proper.

Dated: December 12, 2022                    Respectfully submitted,

*Jessica N. Reid*
Jessica Nicole Reid
Plaintiff in Pro Per

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury.

Dated: December 12, 2022              Respectfully submitted,

*Jessica N. Reid*
Jessica Nicole Reid
Plaintiff in Pro Per

COMPLAINT FOR DAMAGES



Jessica Reid
7474 Creedmoor Rd., Box 218
Raleigh, NC 27613

U.S. District Court
Southern District of New York
**ATTN: PRO SE OFFICE**
500 Pearl St
New York, NY 10007