**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
JESSICA NICOLE REID,                              :
                                                  :
                Plaintiff,   :   22-CV-10708 (JGLC) (OTW)
                                                  :
                -against-    :   **REPORT & RECOMMENDATION TO**
                                                  :   **THE HONORABLE JESSICA G.L.**
LEONARD LARRY MCKELVEY, et al.,                   :   **CLARKE**
                                                  :
                Defendants.  :
                                                  :
                                                  :
------------------------------------------------------------x

**ONA T. WANG**, **United States Magistrate Judge**:

**I.        INTRODUCTION**

Plaintiff Jessica Nicole Reid ("Plaintiff" or "Reid") brings this case against Defendants Leonard Larry McKelvey p/k/a "Charlamagne Tha God" ("McKelvey") and Iheartmedia, Inc. (collectively, the "Media Defendants"), as well as Defendant Simon & Schuster ("S&S") for claims arising out of an alleged sexual assault that took place in 2001.[1] The Media Defendants and Defendant S&S have filed separate motions to dismiss the First Amended Complaint (ECF 62). (ECF Nos. 65, 66, 84, 85, 86). This Report and Recommendation addresses the motion to dismiss filed by the Media Defendants at ECF Nos. 65 and 66. For the reasons below, I respectfully recommend that the Media Defendants' motion to dismiss be **GRANTED** and that Plaintiff be given leave to amend as to certain of her defamation claims.

---

[1] Plaintiff's Amended Complaint asserts the following claims: (1) sexual assault of a minor, assault incident to sexual abuse, and battery during sexual abuse pursuant to the Child Victims Act; (2) defamation pursuant to the Child Victims Act and Adult Survivors Act; (3) intentional infliction of emotional distress incident to sexual abuse pursuant to the Child Victims Act and Adult Survivors Act; and (4) negligent infliction of emotional distress pursuant to the Child Victims Act and Adult Survivors Act.

## II.    BACKGROUND[2]

### A.  Factual Background

Reid met McKelvey in 2001 when she was 15 years old and McKelvey was 22. (ECF 62 at ¶ 12). McKelvey was aware of Reid's age when they met. A few days after meeting her, McKelvey invited Reid on a date. (*Id.* at ¶13). Reid declined, but McKelvey continued to call Reid "from time to time" and eventually took Reid and her friends out to lunch. (*Id.* at ¶¶ 14-16). McKelvey met Reid's mother before taking Reid to lunch and assured her that Reid and her friends were safe with him. (*Id.* at ¶¶ 16-17).

On June 7, 2001, McKelvey called Reid and invited her to his upcoming 23rd birthday party. (*Id.* at ¶ 18). After Reid initially refused, McKelvey "continued to pressure and cajole" Reid to attend, saying she was like a "little sister" to him." (*Id.*). Reid agreed and later made plans to attend the party with Malika Joyner, who was 18 years old and engaged to Reid's older brother, and who agreed to "look after" Reid at the party. (*Id.* at ¶¶ 18, 20).

Instead of McKelvey picking up Reid and Joyner, as Reid had expected, Reid and Joyner were picked up by McKelvey's cousin, Kinta Parker, along with several other men at around 4 p.m. (*Id.* at ¶ 21). Reid and Joyner were driven for over an hour to the party location, stopping along the way at McKelvey's family home where they met McKelvey's father, and to call Reid's mother to assure her that they were okay. (*Id.* at ¶¶ 22-23).

At the party location, a rental unit at the "Short Stay Naval Recreation Center," Reid and Joyner noticed that there were no other women inside. (*Id.* at ¶ 24). Reid expressed to

---

[2] For the purpose of deciding a motion to dismiss, the Court accepts the amended complaint's factual allegations as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

2

McKelvey (who had arrived separately) that she was uncomfortable, and he told her to "relax" and reassured her that "everything was okay." (*Id.* at ¶ 25). McKelvey offered Reid and Joyner drinks. (*Id.*). Reid initially refused, and Joyner accepted. (*Id.*). McKelvey prepared a drink for Joyner. (*Id.*). McKelvey then pressured Reid to accept a drink as well, telling her, "Look, I'm not going to let anything happen to you. You are like my little sister. Nothing will happen to you tonight. I'll take care of you. It's my birthday, just chill and have some fun." (*Id.* at ¶ 26). Reid relented and McKelvey prepared her a drink. (*Id.*).

After starting to drink, Reid and Joyner sat on a couch and Joyner began to feel sick. (*Id.* at ¶ 27). Joyner began to vomit. (*Id.*). Soon, Reid also began to feel sick and tried to walk to the bathroom. (*Id.* at ¶ 28). As soon as Reid stood up, however, her legs collapsed from under her, and she was unable to walk. (*Id.*). Reid heard men at the party laughing at her and Joyner, and heard McKelvey say, "Take her ass upstairs." (*Id.*).

Two men, "Larry" and "Boo," carried Reid upstairs and took her into a bathroom. (*Id.* at ¶ 29). In the bathroom, Larry and Boo began to kiss Reid, pulled up her dress, rubbed her "breasts and butt," and forcibly placed their fingers in her vagina. (*Id.*). Reid was conscious and aware of what was happening but could not move her body. (*Id.*). This continued for an indeterminate amount of time before Larry and Boo left Reid in the bathroom. (*Id.* at ¶ 30). Reid lay on the bathroom floor and cried. (*Id.*).

After another indeterminate amount of time, Larry opened the bathroom door several times and looked in at Reid. (*Id.* at ¶ 31). McKelvey then entered the bathroom, carried Reid into a bedroom and laid her on the bed, and left her alone "for a bit." (*Id.*). After McKelvey left, Larry entered the bedroom and attempted to assault Reid again by "desperately trying to

3

manipulate her body into various positions to achieve penetration." (*Id.*). Reid felt Larry place his penis on her back and attempt to penetrate her. (*Id.*). Larry was unsuccessful and "grew frustrated and left the bedroom." (*Id.*).

Shortly after, McKelvey entered the bedroom again and said, "It's me, this is Charlemagne. [sic] Didn't I tell you I was going to take care of you?" (*Id.* at ¶ 32). Although the room was dark, Reid saw McKelvey's face in the hallway light when he opened the door. (*Id.*). McKelvey got on top of Reid, and she saw his face again. (*Id.*). McKelvey pulled Reid's clothes off and began to kiss her all over her body. (*Id.*). Reid was still unable to move, and McKelvey had his whole weight on top of her. (*Id.*).

McKelvey penetrated Reid and she was unable to resist. (*Id.* at ¶ 33). McKelvey also performed oral sex on Reid and attempted to get Reid to perform oral sex on him. (*Id.*). McKelvey attempted to place Reid on top of him, but she was unstable and unable to stay upright. (*Id.*). McKelvey said, "Come on now, you gotta do something, suck my d**k or something." [sic] (*Id.*). After McKelvey finished assaulting Reid, he left the room and Reid continued to lie on the bed. (*Id.* at ¶ 34). Reid "felt like she had been lying there forever and was very confused and scared." (*Id.*).

After an indeterminate amount of time, another person came into the room, turned on the lights, and saw Reid on the bed. (*Id.* at ¶ 35). Shortly after, several people were standing in the doorway looking at Reid. (*Id.*). Joyner then entered the room, "barely able to stand and slurring her speech," and asked Reid where her clothes were. (*Id.*). Reid started to scream that she was raped, and asked, "Where are my clothes?" (*Id.* at ¶ 36). Reid "still felt like she was

4

drunk even though she did not have that much to drink." (*Id.*). Larry said, "No one touched you, shut the f**k up before I kick you in the head." (*Id.*).

Reid continued to scream and the people in the doorway ran downstairs. (*Id.* at ¶ 37). Reid "does not remember how she got her clothes back on, but she assumed Joyner helped her since no one else was in the room at the time." (*Id.*). Reid and Joyner helped each other down the stairs and found that they were alone in the house. (*Id.* at ¶ 38). Reid and Joyner walked outside, and Reid collapsed and began to cry. (*Id.*). Reid told Joyner that she loved her, "as she was scared and did not know what was going to happen to them." (*Id.*). A man pulled up to the front of the house and asked Reid and Joyner if they wanted to use his phone. (*Id.* at ¶ 39). Joyner accepted the offer and used his phone to call Reid's mother. (*Id.* at ¶¶ 39-40). Reid's mother asked Joyner for information, but Joyner said she "did not know anything" and Joyner gave the phone back to the man, who spoke with Reid's mother and said he would stay with Joyner and Reid until the police arrived. (*Id.* at ¶ 40).

Reid's mother called the police, and the Berkeley County Sheriff's Department arrived at the scene with emergency personnel. (*Id.* at ¶¶ 41, 48). One of the police officers, Officer Arnette, noted a strong odor of marijuana and a number of empty alcoholic beverage containers. (*Id.* at ¶ 41). Officer Arnette went upstairs and observed that, in the upstairs bedroom where the alleged assault took place, "one bed was in complete disarray, with the sheets completely messed up and in a pile in the middle of the bed. A silver bracelet was lying next to the bed in plain view which was later said to be Ms. Reid's." (*Id.*). The bracelet was confirmed to belong to Reid. (*Id.* at ¶ 43). Someone from the Sheriff's Department also identified a hole in the wall in the property; it was determined later that this hole was caused

5

by Reid. (*Id.*). Officer Arnette and another officer, Officer Dawson, called the duty detective to the scene,³ and the detective and naval authorities arrived on the scene. (*Id.* at ¶ 42). Detective Cline, the duty detective, took over the investigation and scene. (*Id.*).

Reid was taken to the Summerville Medical Center in a state of distress, "as she was still in shock, hyperventilating, and feeling unsafe." (*Id.* at ¶ 44). At the medical center, Reid was given a full medical examination and agreed to a rape kit procedure, then discharged into her mother's care. (*Id.* at ¶ 45). For several days after the assault, Reid "locked herself in her room and did not say much to anyone." (*Id.* at ¶ 46). Reid and Joyner gave statements to the police and Reid told them she wanted to press charges against McKelvey and his friends for sexual assault. (*Id.*).

On June 12, 2001, a warrant was issued for McKelvey's arrest on a charge of Criminal Sexual Conduct with a Minor, 2nd Degree in violation of Section 16-3-655 of the South Carolina Code of Laws (*Id.* at ¶ 47); the warrant reads, in relevant part, "the Defendant, who is a twenty two year old adult male, did willfully, unlawfully and feloniously engage in penile/vaginal intercourse with a fifteen year old female child." (*Id.* at ¶ 48). On June 22, 2001, McKelvey was placed under arrest and detained in the Berkeley County Detention Center. (*Id.* at ¶ 49). He was released on a $10,000 surety bond on June 25, 2001. (*Id.* at ¶ 50). On August 28, 2011, McKelvey was ordered by the Berkeley Court to submit to a blood test as part of the criminal investigation. (*Id.* at ¶ 51). On August 29, 2001, McKelvey was indicted on charges of Criminal

---

³ "The Complaint also alleges that the police called "the naval authorities," presumably because of the party's location at "The Short Stay Naval Recreation Center," but the remainder of the complaint alleges that local law enforcement took further steps to investigate and prosecute the assault on Reid.

Sexual Conduct with a Minor, 2nd Degree, and Contributing to the Delinquency of a Minor [Section 16-17-490 of the South Carolina Code of Laws]. (*Id.* at ¶ 52).

Reid filled out a Witness Impact Statement which conveyed the severe physical and emotional trauma she experienced as a result of the assault. (*Id.* at ¶ 53). Specifically, Reid said she was experiencing:

> "pain in [her] hands, fingers and legs; sometimes her stomach hurts [and she has] abnormal periods" "cuts and bruises" "suffering a great deal of pain" "unable to function" "she was nervous and afraid" "mentally suffering" "suffering emotionally" "afraid to return to school" "asking for help" "afraid to go outside" "receiving [psychological] and spiritual counseling."

(*Id.*). Reid also told the Berkeley County Sheriff Department that the stress of the sexual assault and subsequent events caused the family to move to another (unspecified) state. (*Id.* at ¶ 54).

On June 10, 2002, McKelvey pleaded guilty to one charge of Contributing to the Delinquency of a Minor and was sentenced to three years' probation and ordered to pay a $103 fine to the court. (*Id.* at ¶ 55).

In 2006, Reid tried to press charges against McKelvey for the assault but was told by the "sheriff's office" (presumably in Berkeley County) that the statute of limitations had run. (*Id.* at ¶ 66). In 2008, she again attempted to press charges, again, unsuccessfully. (*Id.*).

In the years following the assault, McKelvey has made a number of statements about the assault, which are described in the Amended Complaint as follows:

- McKelvey "lied" about the assault in an unspecified interview, in which he called Reid a "groupie," said he had never met Reid, had nothing to do with the assault, and "bragged about 'beating the case.'" (*Id.* at ¶ 58).

7

- On July 12, 2013, McKelvey "misstate[d] the circumstances" of the assault in a conversation (apparently on air) with DJ Akademiks. (*Id.* at ¶ 59).
- On April 17, 2019, McKelvey said Reid was "involved in a smear campaign" on his show *The Breakfast Club*, which is broadcast on iHeartMedia's platform. (*Id.* at ¶ 60).

McKelvey also discussed the assault in his book, *Black Privilege*, published by Simon & Shuster and Black Privilege Publishing. (*Id.* at ¶ 61). On pages 82–85, McKelvey states that Reid (who is not named in the book and is only referred to as "one of the girls" or "she") "passed out [at the party] and when she woke up later that night, she claimed that some of the dudes at the party had sexually assaulted her." (*Id.*). "Apparently she had gone into a dark room with some guys to have sex and when she started to protest, one of them said, 'Relax, it's Charlamagne.'" (*Id.*). Reid also alleges that McKelvey "has admitted on iHeartMedia's platform and another show that he has raped women in the past." (*Id.* at ¶ 63).

Since the assault, Reid has been suicidal, prescribed antidepressants, and undergone counseling in 2015 and 2017. (*Id.* at ¶ 67). She suffers from extreme post-traumatic stress disorder and "still has dreams and flashbacks of the incident to this day." (*Id.* at ¶ 68). Reid also suffers from intimacy issues "stem[ming] from fear, and she subconsciously associates physical intimacy and touch with pain and danger," and "often tenses up during sex and experience[s] a lot of cramping and burning during intimacy." (*Id.* at ¶ 69). Reid "has a huge fear of being around men, especially in an intimate setting." (*Id.*). McKelvey's large media presence as a TV and radio personality "adds to her emotional distress as Ms. Reid cannot seem to be able to escape from Charlamagne." (*Id.* at ¶ 70).

8

### B. Procedural Background

Plaintiff filed this lawsuit *pro se* on December 19, 2022. (ECF 1). On February 15, 2023, this case was referred for general pretrial management and all dispositive motions. (ECF 8). After she obtained counsel, Reid filed an amended complaint with the Court's leave on September 8, 2023, adding S&S as a Defendant and adding claims against them for defamation and intentional infliction of emotional distress. (ECF 62). The Media Defendants filed their motion to dismiss on October 6, 2023. (ECF 65). Defendant S&S filed its motion to dismiss on January 29, 2024. (ECF Nos. 84, 85, and 86). On August 14, 2024, I issued a Report & Recommendation recommending that Defendant S&S's motion to dismiss be granted in its entirety. (ECF 87).

### III. ANALYSIS

For the reasons set forth below, I find that: (1) Plaintiff's claims under the CVA are barred as untimely; (2) Plaintiff's defamation claims are barred as untimely and, in the alternative for any claims that may be timely, are insufficiently pleaded; and (3) Plaintiff's intentional infliction of emotional distress ("IIED") and negligent infliction of emotional distress ("NIED") claims, even if timely, fail on the merits.

However, this finding should in no way detract from the severity and seriousness of the facts alleged against Defendant McKelvey, both as to the alleged rape and sexual assault of a minor victim whom he referred to as his "little sister," and as to his comments about the alleged assault years after it took place. Plaintiff's allegations are sobering, and were they not barred on procedural grounds, I would recommend they be allowed to proceed to discovery.[4]

---

[4] For example, McKelvey's conduct, as alleged, satisfies the elements of N.Y. Penal Law § 130.35:

### A. Standard of Review

Under Fed. R. Civ. P. 12(b)(6), dismissal must be granted where the complaint fails to contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The Court is limited to the complaint's factual allegations, documents attached to the complaint, matters of judicial notice, and documents which the plaintiff relied on in filing the complaint. *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993). "A court . . . may [also] dismiss a claim on statute-of-limitations grounds at the pleadings stage if the complaint clearly shows the claim is out of time." *Whiteside v. Hover-Davis, Inc.*, 995 F.3d 315, 319 (2d Cir. 2021) (cleaned up).

### B. Child Victims Act

Plaintiff's claims against the Media Defendants fail on several procedural grounds. Plaintiff relies on the Child Victims Act (the "CVA"), N.Y. C.P.L.R. §§ 208(b), 214-g, to revive her assault claims which Plaintiff concedes would otherwise be untimely.[5] (ECF 70 at 9–10). The

---

A person is guilty of rape in the first degree when he or she engages in sexual intercourse with another person:
   1. By forcible compulsion; or
   2. Who is incapable of consent by reason of being physically helpless; or
   3. Who is less than eleven years old; or
   4. Who is less than thirteen years old and the actor is eighteen years old or more.

Reid alleges that she was incapable of consent by reason of being physically helpless, under subsection 2 of the statute. (ECF 62 at ¶ 32). While it is unnecessary to go through all the elements at this time, McKelvey's conduct as alleged also satisfies the elements of rape in the third degree (§ 130.25), sexual abuse in the first degree (§ 130.65), sexual abuse in the third degree (§ 130.55), sexual misconduct (§ 130.20), and forcible touching (§ 130.52).

[5] Plaintiff's claims would be untimely under either South Carolina or New York law. New York's borrowing statute, N.Y. C.P.L.R. § 201, provides that "a district court must apply the *shorter* limitations period of either 1) New York; or 2) the state where the cause of action 'accrued.'" *SOCAR (Societe Cameroonaise d'Assurance et de Reassurance) v. Boeing Co.*, 144 F.Supp.3d 391, 395 (E.D.N.Y. 2015) (citations omitted). Plaintiff's claims are untimely under New York's one-year statute of limitations set forth at N.Y. C.P.L.R. § 215, which began to run in about 2004 when Plaintiff turned eighteen, *see* N.Y. C.P.L.R. § 208. Plaintiff's claims are also untimely under South Carolina law, which provides that "[a]n action to recover damages for injury to a person arising out of an act of sexual abuse or

CVA extends the statute of limitations for "every civil claim or cause of action brought against any party alleging intentional or negligent acts or omissions by a person for physical, psychological, or other injury or condition suffered as a result of conduct which would constitute a sexual offense [against a child]" under New York law which would otherwise be barred by the relevant statute of limitations. N.Y. C.P.L.R. § 214-g. The revival period ran from the effective date of the law, February 14, 2019, to August 14, 2021. *Caldwell v. City of New York*, No. 21-CV-6560 (DEH), 2024 WL 774967 (S.D.N.Y. Feb. 26, 2024), *reconsideration denied*, No. 21-CV-6560 (DEH), 2024 WL 1586695 (S.D.N.Y. Apr. 11, 2024) (citing N.Y. C.P.L.R. § 214-g; 2020 N.Y. Laws ch. 130, § 1); *accord Samuel W. v. United Synagogue of Conservative Judaism*, 194 N.Y.S.3d 25, 26 (1st Dep't 2023) ("[Section 214-g revived claims] for a two-year period which ended on August 14, 2021.").

First, the CVA does not apply to any of Plaintiff's claims because Plaintiff is not a resident of New York and was not a resident of New York at the time of the assault or at any other time, and at the time of the assault in 2001, McKelvey was a South Carolina resident. "CPLR 214–g does not apply extraterritorially, where the plaintiff is a nonresident, and the alleged acts of sexual abuse were perpetrated by a nonresident outside of New York." *S. H. v. Diocese of Brooklyn*, 205 A.D.3d 180, 190 (2d Dep't 2022). This is because "special laws" like the CVA are "extreme examples of legislative power" that must be "narrowly construed." *Id.* (cleaned up). To the limited extent that courts have applied the CVA to instances of sexual

---

incest must be commenced within six years after the person becomes twenty-one years of age or within three years from the time of discovery by the person of the injury and the causal relationship between the injury and the sexual abuse or incest, whichever occurs later." S.C. Code Ann. § 15-3-555. Plaintiff's assault and battery claims are also barred under S.C. Code Ann. § 15-3-530(5) (three-year statute of limitations). Plaintiff's sexual abuse, and assault and battery claims, would have had to have been filed by 2013, or 2007, respectively.

assault that occurred outside of New York, they have done so only when both the perpetrator and the victim were New York residents at the time of the assault. *Samuel W.*, 219 A.D.3d at 422; *ARK265 Doe v. Archdiocese of New York*, 2022 WL 4790507, at *3 (N.Y. Sup. Ct. Sep. 26, 2022).

Second, Plaintiff's defamation and intentional infliction of emotional distress claims, brought "incident to sexual assault," are not revived by the CVA or the Adult Survivors Act (the "ASA"), N.Y. CPLR 214-j, because defamation and intentional infliction of emotional distress do not constitute sexual offenses under New York criminal law.[6] *Holloway v. Holy See*, 537 F. Supp. 3d 502, 505 n.2 (S.D.N.Y. 2021) ("Claims arising pursuant to the CVA must be tied to an alleged violation of New York criminal law[.]"); *accord Samuel W.*, 194 N.Y.S.3d at 25.

Third, even if the CVA did revive Plaintiff's claims, which it does not, Plaintiff's claims were not brought within the revival period. Plaintiff filed her complaint on December 19, 2022, more than a year following the end of the revival period. Courts have uniformly found that the two-year revival period for claims brought under the CVA ended on August 14, 2021. *See, e.g., Jones v. Cattaraugus-Little Valley Central School District*, 96 F.4th 539, 541 (2d Cir. 2024) ("…New York's Child Victims Act … permit[s] plaintiffs to assert claims arising from their sexual abuse as minors during a two-year filing window from August 14, 2019 to August 14, *2021*.") (emphasis added); *Caldwell*, 2024 WL 774967; *Friedman v. Bartell*, 2024 WL 1076736 at *4 (S.D.N.Y. Mar. 12, 2024) ("Plaintiff could have pursued and revived those claims only if he did so

---

[6] Similar to the CVA, the ASA extended the statute of limitations for "every civil claim or cause of action brought against any party alleging intentional or negligent acts or omissions by a person for physical, psychological, or other injury or condition suffered as a result of conduct which would constitute a sexual offense [against a person] who was eighteen years of age or older" under New York law which would otherwise be barred by the relevant statute of limitations. N.Y. C.P.L.R. § 214-j.

by the statutory deadline, as amended, of August 14, 2021."); *Samuel W.*, 194 N.Y.S.3d 25, 26 (1st Dep't App. Div. 2023).

### C. Defamation

Plaintiff's defamation claims appear untimely. The statute of limitations for defamation claims under New York law is one year from the time the defamatory statements were published. N.Y. C.P.L.R. §§ 215(3). Even for those few statements that may fall within the statute of limitations, Plaintiff's claims fail to plead all the elements for defamation.

"Under New York law, a complaint asserting defamation must plausibly allege five elements: '(1) a … defamatory statement of and concerning the plaintiff, (2) publication to a third party, (3) fault, (4) falsity of the defamatory statement, and (5) special damages or per se actionability.'" *Cassava Scis., Inc. v. Heilbut*, No. 22-CV-9409 (GHW) (OTW), 2024 WL 553806, at *5 (S.D.N.Y. Jan. 5, 2024), *report and recommendation adopted sub nom. Cassava Scis., Inc. v. Bredt*, No. 1:22-CV-9409-GHW, 2024 WL 1347362 (S.D.N.Y. Mar. 28, 2024) (quoting *Palin v. N.Y. Times Co.*, 940 F.3d 804, 809 (2d Cir. 2019)). For defamation claims brought by *public* figures, a plaintiff must show a defendant acted with "actual malice." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279–280 (1964). For defamation claims brought by *private* figures, a plaintiff must show only that a defendant acted negligently. *Rodriguez v. Daily News, L.P.*, 37 N.Y.S. 3d 613, 614 (2nd Dep't 2016). "Whether particular words are defamatory presents a legal question to be resolved by the court[s] in the first instance." *Celle v. Filipino Rep. Enterprises Inc.*, 209 F.3d 163, 177 (2d Cir. 2000) (quoting *Aronson v. Wiersma*, 65 N.Y.2d 592 (1985)) (internal quotation marks omitted).

Plaintiff alleges that McKelvey "lied" about the assault in an unspecified, undated interview, in which he called Plaintiff a "groupie," said he had never met Plaintiff, had nothing to do with the assault, and "bragged about 'beating the case.'" (ECF 62 at ¶ 58). On July 12, 2013, McKelvey allegedly "misstate[d] the circumstances" of the assault in a conversation (apparently on air) with DJ Akademiks. (*Id.* at 59). On April 17, 2019, McKelvey allegedly said Reid was "involved in a smear campaign" on his show *The Breakfast Club*, which is broadcast on iHeartMedia's platform. (*Id.* at ¶ 60).

Nearly all the statements alleged in the Amended Complaint were published more than a year before the commencement of this lawsuit. Accordingly, the statements in question are outside the statute of limitations under New York Law.

The only statement in the Amended Complaint that may be within the statute of limitations is a video published on YouTube which contains excerpts of McKelvey discussing the assault. This video was published on September 3, 2022, by an account called "SELFTALK" and is titled "Funk Flex Calls Out Charlamagne Tha God After Tasha K & Jessica Reid Interview."[7] SELFTALK is not a named defendant in the Amended Complaint, has no apparent connection to Media Defendants, and otherwise appears to only republish the statements described in the Amended Complaint.[8] Even if a sufficient nexus existed as to attribute the video to Media Defendants, Plaintiff does not identify with specificity which statements in the video are defamatory and why they are defamatory. At no point in the video does McKelvey specifically

---

[7] SELFTALK, *Funk Flex Calls Out Charlamagne Tha God After Tasha K & Jessica Reid Interview*, YOUTUBE (Sept. 3, 2022), https://www.youtube.com/watch?v=J5YWv9yQRkY.
[8] The Court takes no position on whether SELFTALK may be liable for republishing the allegedly defamatory statements described in the Amended Complaint.

name Plaintiff and the Amended Complaint does not allege any specific facts that directly indicate that McKelvey was speaking about Plaintiff's assault in the video. *C.f. Carroll v. Trump*, 680 F. Supp. 3d 491, 496 (S.D.N.Y. 2023) (describing statements directly referring to the plaintiff: "'Regarding the "story" by E. Jean Carroll, … I've never met this person in my life. She is trying to sell a new book—that should indicate her motivation. It should be sold in the fiction section.'"). While Plaintiff is named in the video, the Amended Complaint does not suggest that the name of the video itself is defamatory of Plaintiff, nor does it tie the title of the video to the statements in the video that are alleged to be defamatory.

Even if Plaintiff identified statements in the video that are defamatory and that they concerned the Plaintiff, it is unclear when the underlying statements *themselves* were originally published, for the purposes of the statute of limitations. The *video* was published on September 3, 2022, but the *statements* were made at some earlier date by McKelvey. The Amended Complaint contains no indication of when the underlying statements themselves were made. Because Plaintiff has not pleaded with specificity which statements are defamatory and why, her defamation claims fail on those grounds as well.[9]

### D. Intentional Infliction of Emotional Distress

Under New York law, a plaintiff must plead four elements to state a claim for intentional infliction of emotional distress: (1) extreme and outrageous conduct; (2) intent to cause severe emotional distress; (3) a causal connection between the conduct and the injury; and (4) severe emotional distress." *Restis v. Am. Coal. Against Nuclear Iran, Inc.*, 53 F. Supp. 3d 705, 729

---

[9] The Court takes no position at this time as to whether republication of earlier statements by a third party could, in some instances, re-start the clock on the statute of limitations.

(S.D.N.Y. 2014) (citing *Bender v. City of New York*, 78 F.3d 787, 790 (2d Cir. 1996)). "The bar for pleading this claim is 'extremely high' and the conduct alleged must be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society.'" *McCollum v. Baldwin*, 688 F. Supp. 3d 117, 132 (S.D.N.Y. 2023) (quoting *Sesto v. Slaine*, 171 F. Supp. 3d. 194, 201–02 (S.D.N.Y. 2016)). Such extreme and outrageous conduct must also "be intentionally directed at the plaintiff without any reasonable justification; a showing of gross recklessness is insufficient." *Levin v. McPhee*, 917 F. Supp. 230, 242 (S.D.N.Y. 1996) (citing *Martin v. Citibank*, 762 F.2d 212, 220 (2d Cir. 1985); *Garland v. Herrin*, 724 F.2d 16, 18 (2d Cir. 1983)).

Plaintiff alleges McKelvey said that Plaintiff "was willingly gang-raped while drugged as a minor" and that "girls like her hung around him at that time intending to be sexually used by him." (ECF 62 at ¶ 126). Plaintiff also alleges that McKelvey admitted to purchasing the drug "Spanish Fly, with the intent of drugging the Plaintiff and forcing her to perform sexual acts, without regard for her juvenile age." (*Id.* at ¶ 127). Plaintiff also relies on the statements described above in her defamation claims. (*See supra* Part III.C.).

While the Amended Complaint adequately pleads that Media Defendants' statements were extreme and outrageous, that Plaintiff has suffered and continues to suffer severe emotional distress, and that such distress is in fact caused by Media Defendants' statements, Plaintiff has failed to allege facts that lead to an inference that Media Defendants' statements were intentionally directed at Plaintiff or were intended to cause Plaintiff severe emotional distress. As discussed previously, the statements by McKelvey do not name Plaintiff, nor do

they reference facts or circumstances that lead to an inference that McKelvey made such statements with the requisite intent.

Because Plaintiff has failed to show that Media Defendants' conduct was intentionally directed at Plaintiff, her IIED claims fail on those grounds.

### E. Negligent Infliction of Emotional Distress

Finally, Plaintiff's negligent infliction of emotional distress ("NIED") claims also fail as they do not sufficiently plead a duty to Plaintiff and a breach of that duty. Under New York law, a plaintiff must plead four elements to state a claim for negligent infliction of emotional distress has four elements: "(1) a breach of a duty owed to the plaintiff; (2) emotional harm; (3) a direct causal connection between the breach and the emotional harm; and (4) circumstances providing some guarantee of genuineness of the harm." *Francis v. Kings Park Manor, Inc.*, 992 F.3d 67, 81 (2d Cir. 2021) (citing *Ornstein v. N.Y.C. Health & Hosps. Corp.*, 10 N.Y.3d 1, 6 (2008); *Taggart v. Costabile*, 131 A.D.3d 243, 252–53 (2d Dep't 2015)). "To establish the fourth element, the plaintiff generally must plead that the breach endangered [their] physical safety or caused [them] to fear for [their] physical safety." *Taggert v. Constabile*, 14 N.Y.S.D. 3d 388, 396 (2d Dep't 2015).

While the facts as alleged by Plaintiff satisfy elements (2) - (4), Plaintiff fails to allege that Media Defendants owed her a duty. "[A] Plaintiff must establish not only that the defendant owed a general duty of care to society as a whole, but also that the defendant owed a specific duty to the particular plaintiff." *Vega v. Fox*, 457 F. Supp. 2d 172, 183 (S.D.N.Y. 2006) (citations omitted). New York courts have held that a specific duty may arise "where there is a relationship either between defendant and a third-person tortfeasor that encompasses

17

defendant's actual control of the third person's actions, or between defendant and plaintiff that requires defendant to protect plaintiff from the conduct of others," such as between a parent and child or common carriers and their passengers. *Hamilton v. Beretta U.S.A. Corp.*, 96 N.Y.2d 222, 233 (2001).

The facts alleged by Plaintiff do not plausibly suggest that a specific duty exists between Plaintiff and Media Defendants. Plaintiff relies on the purported duty that Media Defendants owe to "prevent harm to its listeners, viewers and readers, including Ms. Reid." (ECF 62 at ¶ 135). Plaintiff alleges that McKelvey's conduct "made Ms. Reid a target of Defendants' followers." (*Id.* at ¶ 134). However, this argument fails as "[t]he common law does not ordinarily impose a duty to prevent third parties from injuring others unless the defendant has the authority to control the conduct of such third parties." *Francis*, 992 F.3d at 81. Even if such harm is reasonably foreseeable, this alone is insufficient to create a duty. *See McCollum v. Baldwin*, 688 F. Supp. 3d 117, 131-32 (S.D.N.Y. 2023) ("While Plaintiffs allege that the ensuing onslaught of hateful messages against them was reasonably foreseeable, foreseeability of harm alone does not create a duty."). The Amended Complaint contains no facts to suggest that Media Defendants in any way possess the authority to control the conduct of their followers. Nor does the Amended Complaint plead facts to suggest that Media Defendants exhorted or incited their followers to harass Plaintiff. Thus, because no special relationship exists between Media Defendants and Plaintiff, the law does not impose a duty of care on Media Defendants.

Because Plaintiff has failed to show that Media Defendants owed a duty to Plaintiff and breached that duty, her NIED claims fail on those grounds.

### IV. CONCLUSION

For the foregoing reasons, I recommend that Media Defendants' motion to dismiss (ECF 65) be **GRANTED** in all respects.

I further recommend that Plaintiff be given one final chance to amend her complaint only as to her defamation claims, and only to the extent that the statements published or republished in the SELFTALK video, and any other alleged defamatory statements, were published within one year of the filing of her complaint on December 19, 2022. In other words, statements published before December 19, 2021, are not actionable under New York law. In addition, if Plaintiff does file a second amended complaint, she must plead with specificity which statements are at issue, when such statements were made, and facts to support all the elements of a defamation claim.

### V. OBJECTIONS

In accordance with 28 U.S.C. §636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have fourteen (14) days (including weekends and holidays) from receipt of this Report to file written objections. *See also* Fed. R. Civ. P. 6. A party may respond to any objections within fourteen (14) days after being served. Such objections, and any responses to objections, shall be addressed to the Honorable Jessica G. L. Clarke, United States District Judge. Any requests for an extension of time for filing objections must be directed to Judge Clarke.

**FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.** *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v.*

*Johnson*, 968 F.2d 298, 300 (2d Cir. 1992); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988); *McCarthy v. Manson*, 714 F.2d 234, 237–38 (2d Cir. 1983).

Respectfully submitted,

Dated: August 23, 2024  
      New York, New York

                                                                              /s/ Ona T. Wang  
                                                             **Ona T. Wang**  
                                                             United States Magistrate Judge